Appeal from Third District.

# BIG COTTONWOOD TANNER DITCH CO. v. SHURT-LIFF et ux.

No. 2793.   Decided December 27, 1916.   Rehearing Denied May 5, 1917.   (164 Pac. 856.)

1. WATERS AND WATER COURSES—AGREEMENT BY OWNER OF WATER RIGHT—BINDING FORCE. An owner of a water right could agree to any arrangement as to the use of water which was satisfactory to himself and to the other water users on the ditch, and his agreement as to the amount of water to which he was entitled, if acted upon by the other water users, bound him and those who claimed through him.   (Page 574.)

2. WATERS AND WATER COURSES—RIGHTS OF LANDOWNER—QUANTITY. No landowner is entitled to more water from a ditch for any specific purpose than is reasonably necessary to supply his needs for that purpose, regardless of the quantity that has been used and the length of use.   (Page 578.)

3. WATERS AND WATER COURSES — APPROPRIATION — DIVERSION TO OTHER USE. A landowner may not appropriate water from a ditch for one purpose and then apply it or any part of it to another purpose.   (Page 579.)

4. WATER AND WATER COURSES—METHODS OF DIVERTING AND CONVEYING WATER. Where parties have acquired a vested right to the use of water for beneficial purposes, and have adopted the usual and customary means of conveying it from the point of diversion to the place of use in vogue in this arid region, namely, an open ditch with bed and banks consisting of the natural soil through which it is constructed, they cannot be compelled to substitute and install a more expensive method of diversion in order to prevent loss by seepage and evaporation. They may, however, be compelled to keep their ditch in good repair so as to prevent unnecessary waste.   (Page 579.)

5. WATERS AND WATER COURSES—APPROPRIATION—WASTE. Claimants of water may not waste it, either by applying more than is reasonably necessary to supply their needs for culinary, domestic, or live stock purposes, or in conducting the water from the main source or supply to their premises.   (Page 581.)

6. WATERS AND WATER COURSES — APPROPRIATION — IRRIGATION — WASTE WATER. Where a continuous open stream of water is

permitted to flow to certain premises for culinary, domestic and live stock purposes, a reasonable amount of excess water passing the premises may be used in a garden or orchard, or for other irrigation purposes.  (Page 581.)

7. WATERS AND WATER COURSES—WATER RIGHTS—APPEAL.  In a case involving water rights, though the trial courts possess a better opportunity to reflect the equities of the case than does the Supreme Court, when it is apparent that the trial courts have failed to reflect justice in a particular matter in view of the whole evidence, the parties to the record have the right to invoke the judgment of the Supreme Court on the particular matter.  (Page 588.)

8. WATERS AND WATER COURSES—WATER RIGHTS—APPEAL.  In cases involving water rights in arid regions, the appellate court should be very slow to interfere with judgments unless it is clear that equity and justice require such interference. (Page 588.)

9. WATERS AND WATER COURSES—IRRIGATION—ROTATION—DUTY OF COURTS.  The courts are under duty to prevent discrimination and inequality among water users who have adopted a system of rotation on any particular irrigation system or stream. (Page 588.)

10. APPEAL AND ERROR—CROSS-ERRORS—APPEAL OF CODEFENDANT. Where a codefendant appeals, another codefendant may not, upon such appeal, assign cross-errors against respondent, and secure modification of the judgment in so far as it affects him; the proper procedure is to file a cross-appeal from the judgment. (Page 590.)

11. APPEAL AND ERROR—CROSS-ASSIGNMENTS—OFFICE.  To modify an independent portion of the decree not touched by the appeal is not the office of mere cross-assignments, but the peculiar province of a cross-appeal.  (Page 590.)

McCARTY, J., dissenting in part.

Appeal from District Court, Third District; *Hon. C. W. Morse*, Judge.

Action by Big Cottonwood Tanner Ditch Company against Vincent Shurtliff and Mary E. Shurtliff, his wife.

From the decree, defendants appeal.

REVERSED in certain particulars and cause remanded, with directions; otherwise affirmed.

*Stewart, Stewart & Alexander* for appellants.

*D. W. Moffatt* for respondents.

FRICK, J.

This action was originally commenced by the plaintiff, hereinafter called "respondent," against Vincent Shurtliff and his wife Mary E. Shurtliff, hereinafter called "appellants," to restrain them from interfering with the water in a certain ditch. The complaint was afterwards amended, and all the water users (claiming water rights in. four certain ditches) were made parties to the action. All claimants thus came into court, and each one, including the appellants, set forth his claim to the use of water and the amount thereof in the several ditches aforesaid. It developed at the trial—indeed, it was practically conceded by all claimants—that they were all tenants in common respecting the water flowing in any particular ditch as well as in the waters flowing in the four ditches, and that the title to the waters flowing in all of the .ditches was derived from a common source, to wit, Big Cottonwood Creek. It is important to keep in mind this feature of the case. The case was tried and determined upon that theory.

Upon this appeal appellants' rights to the use of water in only one of the four ditches is in question, namely, the ditch known as the South Branch of the Big Cottonwood Tanner Ditch.

It was made to appear that nearly all of those who owned water rights in the four ditches formed a corporation, which is the respondent' here. The corporation was organized for the purpose of controlling, apportioning, and distributing the water in all of the four ditches to the various owners thereof. The appellants, and a few others, refused to become members of the respondent corporation, and thus its officers, since about 1902, or 1903, have controlled and distributed the water

to those who did not become members as well as to those who did. Appellants, it seems, have always claimed more water than said officers were willing to distribute to them out of the South Branch Ditch aforesaid. The respondent, in its complaint, alleged that appellants interfered with the water in said South Branch, and that they at times diverted and used water therefrom contrary to the regulations prevailing for the distribution and use of the water, and that they diverted more water than they were entitled to from said ditch. Upon the other hand, appellants averred that the respondent arbitrarily, and without right or authority, has restricted them in the use of water for irrigation as well as for culinary and domestic purposes.

After a hearing, the District Court of Salt Lake County determined and fixed the rights of all the water users who did not consent to what was claimed by the respondent constituted their rights in the several ditches, and entered a decree in accordance with the findings of fact and conclusions of law in that regard. The court determined and fixed appellants' rights to the use of water in the South Branch Ditch in the following terms:

"The court further finds that Vincent Shurtliff and Mary E. Shurtliff, his wife, have received and are entitled to receive through the South Branch of the Big Cottonwood Tanner Ditch from the 1st day of January until the 30th day of June of each year forty-one (41) shares of water right, from the first day of July to the 31st day of December of each year, twenty-nine (29) shares of water right."

The court also found and adjudicated that appellants were not entitled to any additional water for culinary or domestic use, and enjoined them from in any way interfering with the water flowing in said South Branch Ditch.

The appellants alone appeal from the findings, conclusions of law, and decree in so far as the same affect them.

One of the other parties to the action has also assigned cross-errors to which we shall refer later.

Appellants' counsel, with much vigor, insist that the court erred: (1) In awarding them only 41 shares of the water of said South Branch Ditch from the 1st day of January to the

30th day of June and only 29 shares during the remainder of each year; and (2) in not awarding them any water for culinary and domestic use in addition to the shares awarded to them.

There is really no dispute between the parties to the appeal respecting the law, nor is the evidence upon the questions that must control here seriously in conflict. While it is true that appellants strenuously insist that they are entitled to more water from the ditch in question for irrigation purposes than the quantity awarded them in the decree by reason of appropriation and use, yet the evidence stands uncontradicted that in the year 1879, in order to arrive at some definite understanding respecting the division and distribution and use of water as between the several ditchs as well as among the owners of water rights in said ditches, the water users, including those on said South Branch Ditch, held a meeting, which they called an arbitration meeting, by which the rights of the several ditches, as well as the rights of the several owners of water rights in each ditch, were determined and fixed. A Mr. Robert Hawker, the predecessor in interest of the appellants, and from whom, in 1883, appellants purchased the land they now own and with respect to which they claim the water right, was a member and participant of that meeting. By that meeting, among other things, it was agreed and determined that the appellants were entitled to 41 shares of water out of said South Branch Ditch from January 1st to July 1st, or July 10th, in each and every year, and to 29 shares to the end of the year. One share of water was intended as representing one acre of land. It seems that thereafter water certificates, or "water tickets," were issued to each owner in accordance with his rights in the ditch from which he obtained his water supply. Mr. Richard Howe, who was familiar with the facts, in referring to what was done, and especially to what Mr. Hawker, the then owner of appellants' land, said, testified as follows:

"It was after they had gotten their certificates, or what I would call certificates, from the board of arbitrators as to the amount of land they had allowed them water for, and Robert Hawker met my father when I was with my father, right on

the corner, northwest corner of the Shurtliff place now, right
in the street.  They together discussed the matter.  Robert
Hawker said, 'Well,' he says, 'I feel perfectly satisfied with
the award they have made me.'  My father says, 'I think they
cut me down about two acres too low.' "

Mr. Fowlkes, who was water master long after the arbitra-
tion agreement was entered into, namely, during the years
1899 to 1902, inclusive, testified that he issued water tickets
to appellants for forty-one shares during the first half and for
twenty-nine shares during the last half of each year.  Indeed,
the evidence to that effect is overwhelming.

Appellants' counsel, however, contend that their clients can-
not be bound by the arbitration agreement, since, as they con-
tend, appellants were not parties to it; and, further, that they
have always protested against the amount of water allowed
them, namely, the forty-one shares and the twenty-nine shares
for the periods aforesaid.  Moreover, counsel insist that their
clients should be allowed a specific quantity of water, meas-
ured in second feet, in accordance with their appropriation
rights.  With all due respect for counsel's contention in that
regard, we are clearly of the opinion that they are in error
upon both propositions.

In considering the first proposition, it must be remembered
that appellants succeeded to all the rights possessed by Mr.
Hawker; no more, no less.  Hawker, as the owner of
the water right, in case of dispute, could agree to any
arrangement which was satisfactory to himself and to
the other water users on the ditch.  His agreements, if acted
upon by the other water users, would not only be binding
upon him, but would also bind all who claim through or under
him, and, in view that appellants claim under him, they are
bound by his agreements.  Appellants are therefore bound by
the arbitration agreement of 1879.  True, there was a slight
modification of that agreement in 1889 to which appellants
were not parties, but that modification in no way affects any
of appellants' rights.  Indeed, the court awarded appellants
the same shares of water and for the same periods of time that
were awarded to Hawker in 1879, and always distributed to
him, and, after he sold to appellants, to them.  Referring now

to counsel's second proposition, namely, that the amount of water appropriated by Hawker and his predecessor in interest, a Mr. Olson, should be awarded to appellants, cannot prevail. This case is not one where the original appropriations can be considered for any purpose. In this case the water owners, as stated before, are tenants in common of all the water in a particular ditch, and each is entitled to the proportion or shares agreed on by the arbitration agreement aforesaid. Neither the parties nor the court can now go behind that agreement, since it is now, and for many years has been, the basis of each water user's rights in any one of the several ditches, just as the trial court has determined in this case. Counsel's second contention, in so far as the same seeks to depart from the number of the shares of water allotted to appellants for irrigation purposes, must therefore also fail.

Counsel, however, further contend that appellants, ever since the early seventies, were entitled to, and have always used, a certain quantity of water for culinary and domestic purposes. Counsel claim that for that purpose appellants and their predecessors in interest have always had a continuous flow of one-half of a second foot of water, and insist that the court grievously erred in refusing to allot to them that quantity of water for those purposes.

While it is true that some of the water masters and others testified that the appellant Vincent Shurtliff refused to abide by the arrangement entered into by the water users of the water flowing in the ditch from which appellants diverted the water allotted to them, and that he, as some of the witnesses put it, "was a law unto himself," yet the evidence is practically without dispute that Mr. Hawker, appellants' predecessor in interest, used a continuous flow or stream of water for culinary, domestic, and live stock purposes, and that the appellants continued to do so, although they did so over the protests of other users on the ditch. Mr. Hawker, however, lived near the ditch in question and obtained his water for culinary and domestic purposes directly therefrom. Some years after appellants had purchased the Hawker farm, they erected a dwelling about one-fourth of a mile from the point where the water is diverted from the ditch in question, and,

after moving into the dwelling, they, subject to the protests aforesaid, continued to use a continuous stream of water from the ditch by means of a small diverting ditch, and their counsel contend that the quantity that was diverted to appellants' premises through the small diverting ditch as aforesaid for culinary, domestic, and live stock purposes, was at least one-half of a second foot of water, and for that reason they now contend that the court erred in not awarding to appellants a continuous flow of one-half second foot of water in addition to the amount awarded them for irrigation purposes. The measurements made from time to time show that the continuous flow claimed and used by appellants at the point of diversion was, if anything, in excess of one-half of a second foot of water. The taking of that quantity of water was, however, made a frequent occasion for disputes between them and the other water users from the ditch, and especially between them and the officers of the respondent corporation whose duty it was to apportion the water among the several users, and to settle·those disputes this action was commenced for the purpose of enjoining the appellants from using said continuous stream of one-half second foot of water in addition to the water awarded to them for irrigation purposes. The District Court awarded the appellants the quantity of water for irrigation purposes hereinbefore stated, but refused to allow them separate water for culinary, domestic, and live stock purposes, and enjoined them from taking any water from the ditch in question except in the manner, at the time, and in the quantities stated in the decree. The District Court therefore denied appellants a continuous flow of water for culinary, domestic, and live stock purposes and limited them to the amount of water that was allowed them for irrigation purposes.

The respective theories entertained during the trial by court and counsel are, in a measure, illustrated by the following colloquy which occurred during the trial:

"Mr. Stewart: What I was about to suggest, the court would award them a given amount which the court would think reasonably equitable and consistent with ther necessity, then they would have to provide means of getting it there.

"The Court: Do you think the court ought to make that kind of a decree?

"Mr. Stewart: I think the court must make a decree awarding culinary water to those entitled to a constant flow of culinary water.

"The Court: Have you figured as to the result of that? Because I don't think there is any question about it. There is no question in my mind. It will take all the water for culinary purposes. There will be no water for irrigation at all if every other user on the stream, the corporation, 90 per cent., we will say in round numbers, own 90 per cent. of the culinary water, and entitled to a continuous stream, and you owning your share, and that takes all the water; how are you going to get any water for irrigation?"

In answer to counsel's further argument, the court said:

"I am merely basing it upon the evidence as I remember it in the Progress case. We spent days introducing evidence of people who had rights to culinary water under the Tanner Ditch."

The claims that counsel make are also shown by their assignments of error. In assignment No. 10, it is urged that the District Court erred in denying appellants' claim for a continuous stream of water for the reason , stating it in their own language that:

"The evidence clearly shows that these defendants (appellants) have heretofore continuously used and are entitled to a constant and continuous stream of culinary water   *   *   *   running to the defendants' home and premises."

In another assignment, counsel state that the court erred in finding that appellants are not entitled "to water for culinary, domestic, and live stock purposes separate and apart from irrigation water," and in that connection it is insisted that appellants "are entitled to the said one-half second foot of water for culinary, domestic, and stock purposes." The foregoing are all the assignments that relate to the water for culinary purposes.

In counsel's brief it is argued that the court erred in denying appellants' claim to a constant flow of water for culinary, domestic, and stock purposes separate and distinct from the

right to water under the basis of an apportionment by "turns"; that is, for irrigation purposes.

I have set forth cunsel's claim in their own language merely to show just what it is. It is thus made very clear that counsel contend that appellants were entitled to a certain quantity of water for irrigation purposes, and that entirely apart from that they were also entitled to a continuous flow of water for culinary, domestic, and live stock purposes. The claim for irrigation purposes, so far as quantity is concerned has already been disposed of, and their claim to have the apportionment made by the court modified will be considered later. The question now to be considered is: Are appellants, under the evidence, entitled to a continuous stream of water for culinary, domestic, and live stock purposes, and, if so, to what quantity of water are they entitled?

While it is true that counsel claim a continuous flow of one-half second foot of water, yet it is also true from their argument that counsel recognize the now well-established principle that no one is entitled to more water for any specified purpose than is reasonably necessary to supply his needs for that purpose. It is also intimated in counsel's argument that conditions might arise, where a tenant in common claims a continuous flow from an irrigating ditch, such claimant perhaps "would have to provide means of getting it there"; that is, from the main ditch to the point of use. In the writer's judgment, although, under the evidence, appellants should be decreed the right to divert a continuous stream or flow of water for culinary, domestic, and live stock purposes from the South Branch of the Big Cottonwood Tanner Ditch, nevertheless the question to be determined is the quantity that should be awarded to them in the decree for such purposes.

It has become elementary doctrine in the arid region that no one is entitled to a greater quantity of water for any particular use or purpose than is reasonably necessary to supply the needs of the claimant for the specified purpose. This is true, regardless of the quantity that has been used for such purpose and the length of time it may have been used. The doctrine is well and clearly stated in a recent case emanating

from the Supreme Court of Oregon, entitled *Little Walla Walla Irr. Union* v. *Finis Irr. Co.*, 62 Or. 348, 124 Pac. 666, 125 Pac. 270, in the following words:

"The actual amount of water needed for the use to which it is to be applied is the limit to which a party is entitled to water for irrigation, regardless of the fact that he may have actually diverted much more water for a long period of time."

Indeed, that is the rule laid down by our statute. Comp. Laws 1907, Section 1288x20.

In *Union Mill & Min. Co.* v. *Dangberg* (C. C.) 81 Fed. at page 94, Mr. Justice Hawley, United States District Judge for Nevada, after referring to the fact that the law is progressive, in his usual clear and vigorous style, after stating the elementary principles which control the appropriation and use of water in the arid regions of the United States, says:

"He (the claimant) will be restricted to the quantity of water needed for the purposes of irrigation, for watering his stock, and for domestic use; that the same rule applies to an appropriation made for any other beneficial use or purpose; that no person can, by virtue of his appropriation, acquire a right to any more water than is necessary for the purpose of his appropriation."

Moreover, the claimant may not appropriate the water for one purpose and then apply it, or any part of it, to another purpose. The courts also have the power to **3, 4** prevent a claimant from wasting water, and within reasonable limits may prevent waste through the means or channels that the claimant uses for diverting and taking the water from the main stream to the place of use. While that branch of the law may still be in a stage of development, yet some courts have expressed themselves quite forcibly upon the subject. In *Town of Sterling* v. *Pawnee D. E. Co.*, 42 Colo. at page 430, 94 Pac. at page 341, 15 L. R. A. (N. S.) 238, the Supreme Court of Colorado in speaking through Mr. Justice Gabbert, in referring to what may constitute waste by the means used in conveying water, said:

"The law contemplates an economical use of water. It will not countenance the diversion of a volume from a stream which, by reason of the loss resulting from the appliances used to convey it,

is many times that which is actually consumed at the point where it is utilized. Water is too valuable to be wasted, either through an extravagant application for the purpose appropriated, or by waste resulting from the means employed to carry it to the place of use, which can be avoided by the exercise of a reasonable degree of care to prevent unnecessary loss, or loss of a volume which is greatly disproportionate to that actually consumed. *Montrose Canal Co.* v. *Loutsenhizer D. Co.,* 23 Colo. 233 (48 Pac. 532.) An appropriator, therefore, must exercise a reasonable degree of care to prevent waste through seepage and evaporation, in conveying it to the point where it is used. In cases where this question arises, the purpose for which the appropriation is made and the proportion of the diversion actually applied to a beneficial use, as compared with the volume diverted, would doubtless be important matters to consider."

In *Courthouse Rock Irr. Co.* v. *Willard,* 75 Neb. at page 411, 106 N. W. at page 464, the Supreme Court of Nebraska, in referring to this subject, says:

"It is an essential purpose of our irrigation laws to require an economical use of the waters of the state. The plaintiffs have an adjudicated right to the use of 30½ cubic feet of water a second of the waters of Pumpkin Seed creek, so far as they beneficially use the same; but they are not permitted to take water from the stream which they cannot apply to a beneficial use, or, what amounts to the same thing, they are not entitled wastefuly to divert water into a canal which is so defective as to waste and dissipate the water, which otherwise might serve a good purpose, if used by other appropriators or riparian owners whose priorities are inferior or subsequent to the rights of the plaintiff."

So, in 2 Kinney, Irrigation (2d Ed.) Section 1913, the author says:

"As was said in a preceding section, there is always some necessary loss by seepage and evaporation in conducting the water from the point of diversion to the place of use and its application at that point. But any loss by means of defective appliances for conducting the water will not be treated as necessary loss, but as waste. So, also, where there is excessive seepage from the ditches and canals which might with a reasonable effort and expense be prevented. Water is too valuable to be wasted, either through an extravagant application to the purpose for which it was appropriated, or, again, by waste resulting from the means employed to carry it to the place of use, which can be avoided by the exercise of a reasonable degree of care to prevent unnecessary loss. With water each year growing scarcer as compared with the needs for it, as

the law now stands in all the jurisdictions it will not countenance a diversion of a volume or quantity of water from a stream which, by reason of the loss resulting from the defective appliances used to convey it, is many times that amount which actually reaches the point of use and 'is there consumed for the purpose for which it is appropriated."

Now, the testimony of all the witnesses who testified upon the subject is that appellants' means of diverting and conducting the water they use for culinary, domestic, and live stock purposes is through a small diverting ditch constructed and maintained by themselves. In speaking of the character of the soil over or in which that ditch is constructed, Mrs. Shurtliff, one of the appellants, testified:

"The bed of the ditch is   *   *   *   very gravelly, porous soil. Much of it (the water) is lost before it reaches the house."

Mr. Doremus, a civil engineer who measured the water flowing in the ditch used for culinary, domestic, and live stock purposes, testified:

"The larger portion of that water   *   *   *   was lost in transportation and seepage, and some passed beyond the point of use."

It is not necessary to refer further to the testimony on this point, since it is all one way. The testimony is likewise undisputed that appellants did not usually own a large number of live stock. They always owned a few cows and other live stock, sometimes a few more than at other times, perhaps a few hogs, some chickens, ducks, etc. The amount required for family use is likewise not large. Appellants concede, as all must concede, that one-half second foot of water contains many, many times the quantity that they actually required for culinary, domestic, and live stock purposes. If there were any doubt regarding that matter, however, it can easily be dispelled. One-half of a second foot of water, according to the standard of measurement adopted by our statute, under ordinary conditions amounts to a flow of 224 gallons per minute, 13,464 gallons per hour, and 323,136 gallons for each twenty-four hours. True, it is contended that water that was not used for culinary, domestic, and live stock

purposes was, nevertheless, permitted to run into an orchard that was on the place to irrigate the trees growing therein. As we have seen, however, the constant stream that is claimed by appellant is for culinary, domestic, and live stock purposes, and not for irrigation. Indeed, no one in this arid region would be permitted to claim a constant stream for irrigation purposes, even though the claim were made by a prior against a subsequent appropriator. As between tenants in common, however, such a claim is not to be thought of. I shall not attempt, nor is it necessary to offer, further argument that appellants' needs cannot and do not require such a large quantity of water for culinary, domestic and live stock purposes. Nor can they claim water for culinary, domestic, and live stock purposes and then devote it, or any considerable part of it, to irrigating purposes. That they may not do that, the law, as I have pointed out, is well settled. Niether may they waste water either by applying more than is reasonably necessary to supply their needs for culinary, domestic, and live stock purposes or in conducting the water from the main source of supply to their premises or point of use. It cannot be successfully disputed, therefore, that only a very small part of the water that appellants claim is necessary to supply their needs for the purposes aforesaid. Neither can there be any dispute that they may not, under the law, apply any of that water for irrigation and in that way enlarge their right to the use of water. True it is that, where a continuous open stream of water is permitted to flow to certain premises to be used for culinary, domestic, and live stock purposes, there necessarily must be some excess water pass the premises, or what is generally termed waste water. No doubt, such waste water, if reasonable in amount, may be used in a garden or orchard, or for other like purposes. The question, however, is: May a single family, which is shown to be not a large one, claim a flow of water of 13,464 gallons every hour, or a quantity of practically 1,000,000 gallons every three days, for culinary, domestic, and like stock purposes? I think no reasonable person would so contend. But, as we have seen, the testimony is that most of the water that is diverted from the main ditch into appellants' diverting ditch is lost between the point of diversion and the point of use

(the dwelling of appellants), which two points, by measuring along the course of the small diverting ditch, the evidence shows are about one-fourth of a mile apart. The loss, the testimony shows, is caused by seepage by reason of the gravelly and porous nature of the soil. The question therefore arises: Does this vast amount of seepage constitute waste?

No doubt, if water were plentiful it might not be so regarded. Where, however, as the testimony discloses, water is as scarce as it is in the vicinity where all the water in question is being used, it seems to me to be a frightful waste of water. The ordinary duty of water is about seventy acres to the second foot. That is, a continuous flow of one second foot of water will be sufficient to properly irrigate about seventy acres of land. A half second foot of water will therefore suffice for one-half of that quantity, or for thirty-five acres. The appellants are allowed a little more than one-half a second foot of water to irrigate their forty-one or forty-two acres of land. They thus claim for culinary, domestic, and live stock purposes almost as much water as they and their neighbors are allowed to irrigate a small farm of about forty acres. What does that mean? Let us assume that there are ten water users along the main ditch from which appellants divert their water, each one of whom claims one-half a second foot of water for culinary, domestic, and live stock purposes. That would be sufficient water to irrigate about 350 acres of land. The mere statement of the fact shows that to allow appellants one-half a second foot of water for the purposes aforesaid would constitute a frightful waste of water, and that such would be the fact whether the water is wasted at the point where it is used or in conducting it to the point of use. Moreover, it is a matter of common knowledge that neither ordinary ditches nor natural streams sustain such a percentage of loss in flowing a distance of only one-fourth of a mile, nor anywhere near such a percentage. If such a percentage of loss for so short a distance were normal or natural, irrigation would have to cease in this part of the country. Indeed, it never could have been successfully attempted. Upon the other hand, if it requires one-half second foot of water to supply the needs of an ordinary family which owns no more live stock than is

owned by the appellants, then again would it be impossible to obtain sufficient water for irrigation purposes. That, it seems to me, was the view entertained by the District Court, and for the further reason that all of the water claimants whose rights are involved in this action are tenants in common, and because practically all of the claimants obtain their water for culinary use from other sources, the District Court no doubt deemed it equitable to deny to all claimants the right to a continuous flow of water for such purposes. While both my experience and observation lead me to the conclusion that it is not always wise for this court to interfere with a decree which fixes the rights of the water users where, as here, the case shows careful consideration, and where the judge has had the advantage of personal inspection of ditches and sources of supply, and where, as here, we know the judge to be very careful and conscientious, yet, under the evidence in this case, the appellants would be entirely deprived from the use of water for the purposes aforesaid if the decree as it now stands shall be affirmed. One way out of the dilemma was the one adopted by the District Court, and perhaps that way was the most equitable and, at any rate, the least objectionable to all of the other water users who are cotenants with appellants. Another way would be to award to appellants the one-half second foot of water claimed by them upon the ground that the evidence shows that they, in the past, have diverted that quantity from the main ditch. The method adopted by the court, in view that appellants have no other means of obtaining water for culinary, domestic, and live stock purposes from any source, as I view it, would not only work a gross injustice and hardship upon them, but it would deprive them of a vested right. Upon the other hand, if the appellants should be awarded a continuous flow of one-half second foot demanded by them, it would, in the long run, work a like gross injustice upon all of the other water users who are cotenants with appellants, and would likewise deprive them of vested rights. It must, however, not be assumed that appellants have a vested right to the one-half second foot of water; but their vested right is limited to a sufficient amount to supply their needs for the purposes aforesaid. Nor did

they acquire a vested right in the quantity diverted by them so long as that quantity was not reasonably necessary for the purposes for which it is claimed. A mere cursory reading of the record forces the conviction that water in the vicinity involved in this litigation is too valuable to permit it to be wasted to such a frightful extent as must be the case if appellants are permitted to divert a continuous flow of water amounting to the enormous quantity of 323,136 gallons each day for culinary, domestic, and live stock purposes. Can this court, or any other court for that matter, prevent appellants from permitting the waste?

It is contended, and such has been the ruling of some courts, that, although waste may result from conveying water in or through a ditch in the way that water is ordinarily conveyed, yet the court cannot prevent such a waste by compelling the user to pipe the water in order to stop the waste. I have, however, also quoted from recent cases where it is held that if unreasonable waste results from conveying water through a defective flume, or even through a ditch, the courts have the power to prevent the waste if it can be done by the application of reasonable means of conveyance. It seems to me those cases are sound, and, in view that water in this arid region is life, and is too valuable to be wasted for any purpose, courts should prevent waste whenever it is possible to do that by the application of reasonable means of diversion and conveyance and by such as are not prohibitive by reason of their cost. It would seem that in this case most any means that could be applied, other than the diverting ditch in question over the gravelly and porous soil which would save the water thus wasted, would cost much less than would be the value of the water that would be thus saved, and for that reason the cost of better means not only would not be prohibitive, but in the long run would be a matter of economy. As I view the record, it is, however, not necessary at this time for this court to determine, nor is the evidence sufficient for us to determine, whether the appellants should be required to substitute any particular means of conveying the water allotted to them for culinary, domestic, and live stock purposes other than the small diverting ditch now in use. As pointed out, court and counsel, during the trial,

differed with respect to appellants' right to any water for culinary, domestic, and live stock purposes, and the court then intimated that it would not allow them any water for those purposes in addition to the quantity of water that would be awarded to them for general irrigation purposes. The question of waste by reason of the gravelly and porous nature of the soil in which appellants' small diverting ditch is constructed and maintained, and whether the ditch itself could not be so repaired or improved and maintained as to prevent at least the greater portion, if not all, of the waste, was not considered by the court. Nor did the court consider or pass on the question of what quantity of water would be reasonably sufficient to supply appellants' needs for the purposes aforesaid. Nor were those questions fully developed by the evidence. The state of the record, therefore, is not such that we can make proper findings upon those questions, or direct findings to be made thereon. It may well be that, when the court hears the evidence respecting the quantity of water appellants may require for culinary, domestic, and live stock purposes, and goes thoroughly into the facts regarding the construction and physical condition of appellants' small ditch, and with regard to whether the waste occurs throughout the entire length of that ditch, or only at particular places therein, and whether the waste as it now occurs can be prevented by the use of reasonable means of diversion, the party may be satisfied with the order the court may make in that regard. Moreover, it may well be that the parties may be able to amicably agree upon some reasonable means of diverting and conducting the water to prevent the great waste that is now going on when the quantity of water is once established to which appellants are entitled for culinary, domestic, and live stock purposes.

I am of the opinion, therefore, that the findings and conclusions of law made by the court that the appellants are not entitled to a continuous flow of water from the main ditch for culinary, domestic, and live stock purposes should be set aside, and that the case should be remanded to the District Court to hear further evidence upon the matters above suggested, and to make such findings of fact, conclusions of law,

and decree with respect thereto as the evidence may warrant and such as are in harmony with the views expressed in this opinion. If either party is dissatisfied with the court's findings and decree concerning the matters just stated, such party may appeal to this court, and we shall then be better able to lay down some permanent rule regarding the means that water users must adopt to prevent unreasonable and unnecessary waste of water.

Appellants, however, complain of another matter with respect to which they contend the trial court committed serious error. From the great weight of the evidence it is made to appear that appellants' farm is located right under the foot-hills and one of the first, if not the first, that is watered from the South Branch Ditch; that the soil is loose, gravelly, and very porous, and it requires more water than does ordinary soil; that in applying the water used for irrigating the lands lying lower down on the ditch in question such lands obtain the benefit of much, if not all, of the seepage from the higher or upper lands, such as appellants', and therefore the lower lands, during the irrigation season, require considerable less water for the same acreage and for like crops than do the upper lands, and especially lands with soil like that of appellants. It was made to appear that, in distributing the water for irrigation, what is known as the rotating system has for many years been applied by the water users on the several ditches, including the South Branch Ditch. That system has been continued by the respondent corporation, but it seems the periods of time for the use of water have been lengthened or extended. Appellants insist that respondent has fixed and threatens to continue in force the periods for the use of irrigating water at nine-day periods, so that each user on the ditch will obtain the entire stream flowing therein once in approximately nine days. Appellants produced much evidence to the effect that in view of the porous and gravelly character of their land, it requires the use of water oftener than once in nine days. Indeed, their evidence is to the effect that they need it as often as once in five or six days in order to produce full crops. The evidence is also to the effect that many of the users lower down the ditch who have the benefit of seepage,

and whose lands are composed of heavier and firmer soil, need water less often and require less in quantity than appellants, and that such lands can produce crops if watered at intervals of nine days. The court made general findings upon that phase of the case, and there is nothing in the decree with respect to it, except a general statement which agrees with the findings, which is as follows:

"The court further finds that regulations should be adopted and provided so that the owners of water right, including the defendants herein to whom water is awarded, shall take all or such portion as they may be entitled to in as nearly a continuous flow as is reasonably possible, taking into consideration the necessity of rotation of turns for the purpose of increasing the efficiency and beneficial use of said water, in order that the owners thereof may have such part of the same as is necessary for their culinary, domestic, and stock purposes."

The appellants complain of these findings. Here again we meet a situation concerning which no hard and fast rule can be stated. In these matters the trial courts, as a general rule, possess a far better opportunity to reflect **7, 8, 9** the true equities of a given case than do we, and yet when it is apparent that the trial courts have, for some reason or for no reason, failed to reflect justice in a particular matter in view of the whole evidence, the parties to the record have the right to invoke, in this class of cases, our judgment upon that particular matter. It seems to us that the facts of this case clearly demonstrate that mere uniformity may be far from equity or equality. Here it is quite apparent that a lower water user with a different soil may not require the water as often, nor for the same length of time, in order to mature his crops, as is the case with the user higher up the stream. In such a case, is there no way that a court of equity may bring about at least approximate equality? If there is none, then it is plain that some such owners must suffer injustice. Here again the record is not sufficient for us to give nor to direct what the action should be. In justice to the trial court, it should be stated, however, that the case was not heard nor tried with the purpose of dealing with that phase of the case; and yet the question is involved, and, if the par-

ties cannot be given relief in this case, we cannot see how they ever can obtain any. We repeat that cases like the one at bar call for the highest and most careful exercise of the equitable powers of courts. Moreover, appellate courts should be very slow to interfere in this class of cases, unless it is clear that equity and justice require such interference. Under the facts and circumstances of this case, however, it seems to us that it is practicable to bring about some more equitable distribution of the water than the one proposed, namely, a rotation period of nine days or more. If we, however, undertook to indicate what other period of rotation should be adopted, in view of the record as it now stands, we might, perhaps, do more harm than good. In view that the rotation of the use of waters for irrigation very materially aids in saving as well as in enlarging the duty of water, the courts favor, whenever possible, that system. While the question of whether the courts possess the power to compel rotation against a nonconsenting water owner may not be thoroughly settled, and while the question is not before us in this case, yet the duty of the courts to prevent discrimination and inequality among the users who have adopted a system of rotation on any particular system or stream, cannot be doubted. See 2 Kinney on Irrigation (2d Ed.) Sections 909, 910. We shall therefore subject to the right of review, leave the whole matter in that regard to the judgment of the trial court, in whose judgment and ability to find some equitable solution for the difficulty presented in this case we have the fullest confidence.

Upon the questions, therefore, involving the fixing of the quantity of water appellants are entitled to for culinary, domestic, and live stock purposes from the South Branch Ditch and the prevention of the waste thereof and means of diversion they shall be required to use, and the further question relating to the periods of rotation and the length of time the upper water users shall have the use of the water as compared with the users lower down the ditch, the judgment must be reversed. The judgment therefore is, accordingly, reversed in those respects, and the case is remanded to the District Court of Salt Lake County to hear such additional evidence as the court may deem proper and necessary to make the neces-

sary findings of fact and conclusions of law upon the questions that are left open, and to enter such a decree as to the court may seem proper and equitable, keeping in view the general propositions we have endeavored to lay down in this opinion.

Finally, there are cross-assignments to be disposed of. One of appellants' codefendants has assigned what are termed cross-assignments of error, by which it is sought to have certain findings and certain parts of the decree 10, 11 modified in favor of the party making the cross-assignments aforesaid. In the case of *Railroad* v. *Board of Education*, 35 Utah 13, 99 Pac. 263, we had occasion to announce the rule respecting the propriety of assigning cross-errors on one appeal. It is there held that the respondent may always assign cross-errors against the appellant, not only to support the judgment, but also to obtain affirmative relief against the appellant. It may also be that a codefendant may assign cross-errors against his codefendant who is the appellant for the purpose of maintaining the judgment against such codefendant and appellant. We, however, know of no authority which goes to the extent of holding that where a codefendant appeals another codefendant may, upon such an appeal, assign cross-errors against the respondent in the action and in whose favor the judgment appealed from was rendered. In this case the party who assigns the cross-errors neither seeks to maintain the judgment against the appellant, nor does he assail appellants' contentions. What he seeks is a modification of the judgment in so far as it affects him. This we are powerless to grant upon the assignment of cross-errors which are assigned by a codefendant. If the party who assigns cross-errors desired to reverse or modify the judgment as it affects him and the respondent, the very thing he seeks to do here, he should have filed a cross-appeal from the judgment. We have no power to interfere with the judgment, except upon the appeal presented by the appellants. Moreover, that part of the decree the appellants complain of, and that portion which is sought to be modified by the assignment of cross-errors, have no connection. To grant what appellants seek in no way modifies or affects that portion of the decree which is

sought to be modified by the assigned cross-errors. To grant the relief, therefore, which is sought by the cross-assignments, would result in modifying an independent portion of the decree which is not touched by the appeal. To do that is not the office of mere cross-assignments of error, but is the peculiar province of a cross-appeal. We therefore cannot consider or pass upon the merits of the cross-assignments of error.

For the reasons before stated, the judgment or decree, appealed from is reversed in the particulars hereinbefore stated, and the cause is remanded to the District Court, with instructions to make findings and to enter a decree in conformity with the views herein expressed. In all other respects, and as to all other parties, the judgment or decree is affirmed. Appellants to recover costs on appeal.

McCARTY, J. (dissenting in part).

I concur in the conclusions reached by my Associates on all points except those relating to the extent of certain of the defendants to divert from plaintiff's canal continuous streams of water for culinary and domestic purposes which, in some cases, is also used for irrigating gardens and orchards. Attention is invited to the probable loss of water by seepage and evaporation in case those who have acquired a vested right to a constant stream for culinary and domestic purposes are permitted to continue to exercise such right. Reference is also made to the amount of water in second feet that it would require to furnish each of these parties with a given quantity of water for the beneficial purposes for which they have heretofore appropriated and used it. Of course, these parties are not entitled to divert or have turned to them more water than is reasonably necessary for the beneficial uses to which they have heretofore applied it. If, however, it is necessary for each of them to divert a given quantity of water from the canal to supply their homes with potable water for culinary and domestic purposes, and they have by long and continuous use acquired a vested right to divert or have turned to them such quantity of water, I know of no rule of law or principle of equity by which they, or any of them, can be deprived of,

or curtailed in such rights in order to increase the supply of their cotenants for farming purposes.

The evidence, without conflict, shows that defendants, Vincent Shurtliff and his wife, Mary (Sadie) E. Shurtliff, and their predecessors in interest, have continuously, and practically uninterruptedly for about ten months of each and every year, for more than forty years, diverted from plaintiff's canal, referred to in the record as the South Fork of the Tanner Ditch, a stream of water of not less than one-half second foot, and conveyed the same in an open ditch to their residence and there used the same for culinary and domestic purposes. The record also shows that this stream of water has also been used by the Shurtliffs during the irrigation season for irrigating an orchard and garden. On this point Mrs. Sadie E. Shurtliff testified in part as follows:

"We bought our place in the fall of 1883 and took possession in the spring of 1884, and have lived there ever since. * * * Ever since we have been there we have used a stream of water for culinary, domestic, and stock purposes from the South Fork of the Tanner Ditch. We have been entirely dependent upon it. We have lived in the house where we now live 19 years. We have always had from 10 to 15 dairy cows, from 40 to 50 head of young stock, from 8 to 10 head of horses, and some poultry. * * * We used the stream of water that now runs to our house for culinary purposes, and there is land there with orchard and gardens in it, and we let it run there too."

She further testified:

"From my experience in using this culinary water, and from the use to which it has been put right from the beginning, I would say that it would not be possible to get along with less water than we have had."

A. F. Doremus, a civil engineer, testified in part as follows:

"I measured the culinary stream of water leading from the South Fork of the Tanner Ditch down to the Shurtliff house (April 7, 1913). It measured substantially half a second foot. I measured it at a point near where it is diverted from the South Fork of the Tanner Ditch. * * * It seems there was a considerable decrease in the flow. * * * There was

a less flow at the house than at the point where I measured it. It appeared to me that the condition of the water wasn't any too good for drinking purposes, still they use it for that purpose, and apparently for stock purposes. * * * They could not consume it all. There would be some that would pass, but, as far as the volume there, it seemed to me necessary for the purity of the water. * * * I did not follow it out to where it went to (after it passed the house). It seemed to me it was flowing in an orchard below."

Vincent Shurtliff, one of the defendants, testified:

"The stream which Mr. Doremus measured is about the size stream I have diverted since moving into my new house (19 years). This size stream is necessary in order to reach me and supply me with culinary water and water for domestic purposes."

And again:

"Besides using this stream for culinary purposes, I had an orchard at the north of my house, and also had an orchard at the south, a little southeast, and I would water these two tracts of land and also the land that runs right down by the creek. Probably it would amount to three acres, maybe four."

The evidence shows that the bed of the ditch through which this culinary stream of water flows is "very gravelly and porous," and that "much of it (the water) is lost before it reaches the house."

No claim is made, nor does the evidence show, that the ditch has been, or is being, maintained in a condition that causes unnecessary waste by seepage or evaporation, considering the character of the land on which it is located. The means, therefore, by which this stream of water is, and for more than forty years has been, conveyed from plaintiff's canal to the point where it is used for culinary and domestic purposes and for irrigating an orchard and garden, are the same as those usually, and almost universally, used by farmers and other water users throughout the farming district of this arid region, namely an open trench or ditch with bed and banks consisting of the natural soil through which it is constructed. The Shurtliffs and their predecessors in interest have, by the continuous and practically uninterrupted use of this culinary stream for

more than forty years, acquired a vested right to use it for the purposes mentioned. Article 17, Constitution Utah.

It has been suggested that, in order to prevent loss by seepage and evaporation, or to reduce such loss to a minimum, the Shurtliffs should be required, as a condition precedent to their right to continue to divert and use the water for the purposes mentioned, to adopt a more economical method of conveying the water to the place of use than the one heretofore and now being used by them. No particular method is suggested. The only means of diversion other than the open trench or dirt ditch in vogue in this state that we know of is the conduit ditch or canal lined with wood, stone, or cement, and the pipe line, either of which is much more expensive to construct than is the open, unlined trench or ditch. The Shurtliffs, and their predecessors in interest, having adopted the usual and customary means of diverting and conveying to their premises the culinary stream of water mentioned, in vogue in this state, I know of no rule of law or principle of equity that can be invoked to support a decree compelling them to construct or install a more expensive method of diversion. But, as I have heretofore suggested, they have acquired a vested right to continue to appropriate by their present means of diversion the same volume of water from plaintiff's canal heretofore diverted and used by them. They are protected in this right by Article 17 of the Constitution of this state, which provides:

"All existing rights to the use of any of the waters in this state for any useful or beneficial purpose, are hereby recognized and confirmed."

At the time the Constitution was adopted and went into effect, this culinary stream of water was being, and for more than twenty years had been, continuously and uninterruptedly used by the Shurtliffs and their predecessors in interest for the purposes mentioned.

The following authorities also support the foregoing conclusions: Long, Irr. Section 42; 3 Farnham, Water and Water Rights, Section 675; 1 Wiel, Water Rights (3d Ed.) 526; *Little Walla Walla Irr. Union* v. *Finis*, 62 Or. 348, 124

Pac. 666, 125 Pac. 270; *Barrows et al.* v. *Fox*, 98 Cal. 63, 32 Pac. 811.

In the last case cited the court said:

"Ditches and flumes are the usual and ordinary means of diverting water in this state, and parties who have made their appropriations by such means cannot be compelled to substitute iron pipes, though they may be compelled to keep their flumes and ditches in good repair so as to prevent any unnecessary waste."

I therefore, as to this point, think that on a remanding of the case the trial court should make findings and enter a decree awarding the Shurtliffs the right to take from plaintiff's canal at the intake of the ditch one-half second foot of water for culinary and domestic purposes and for irrigating a garden and orchard.

STRAUP, C. J.

I concur in the result reversing the judgment. I think the court dealt too scantily with the Shurtliffs. They, for purposes of irrigation, were well entitled to forty-two shares of water out of the South Branch Ditch, each share representing enough water to irrigate one acre for growing and maturing crops. The court, I think, meant to give them that, though the decree is not as definite in such respect as it should be. It therefore ought to be reframed so as not to leave that in doubt.

I also think the court granted too long an interval, once every nine days during the irrigating season, in which the Shurtliffs may use the water. They, during such season, and for growing and maturing crops, ought to be permitted to use the water at least every six days. Considering the situation and the character of the lands, I, on the record, do not see how they can grow and mature crops with a longer interval of rotation. I think the decree, without further hearing, ought to be so modified. That question was fully gone into and developed, and I see no necessity for any further hearing thereon.

In addition to these waters, the Shurtliffs also acquired a clear right in and to a constant flow of water at their premises for culinary, domestic, and live stock purposes. This the

court denied them. In that we all agree that the court erred and thereby deprived the Shurtliffs of a vested right. The important question, of course, is: How much water is necessary for such purposes? It may well be conceded that they are not entitled to a constant flow of one-half second foot at their premises. The perplexing question is: What quantity of water at the point of diversion at the South Branch Ditch is required to produce a constant flow of sufficient potable water at their premises for culinary, domestic, and live stock purposes? On the record, I am not prepared to say what quantity is so required, and hence am not prepared to say that a one-half second foot at the point of diversion is too much, or that a less quantity will suffice. That, as I understand it, is the very question we leave open to the trial court to ascertain and fix. And I think it ought to be left that way, uninfluenced by us, inasmuch as the trial court proceeded on the theory that the Shurtliffs were entitled to no culinary water, and hence found it unnecessary to hear or determine what quantity was required to be diverted to produce a constant flow of sufficient potable water at their premises. For this purpose I think the case should be remanded.

Nor do I express any opinion as to the means of conveying the water from the point of diversion to the premises. Since, however, the matter is referred to, I feel called upon to observe that the Shurtliffs are entitled to all the waters appropriated and used by them and their predecessor for culinary, domestic, and live stock purposes. Their right to them is vested and may not be taken from them. Of course, the waters, as all waters, must be devoted to a beneficial use and must not be wasted. The Shurtliffs, from the point of diversion to their premises, conveyed the water in an open ditch running through porous and gravelly soil. It is apparent that to convey to their premises a constant flow of water coursed through such a ditch and under such conditions a greater quantity of water is required to be diverted than if the water coursed through some other soil, and a still less quantity would be required if it were flumed or piped. I do not see how the Shurtliffs could complain if a sufficient constant flow of potable water for their need were delivered to them at their

premises by a tight ditch, or flume, or pipe, thereby reducing the amount of water required to be diverted; but I do not see how the Shurtliffs can be required to bear such additional cost or expense. An open ditch in this state is a usual and ordinary method of conveying water. To prevent unnecessary waste, water users, of course, must keep their ditches in good repair. But I do not understand that the question of unnecessary waste is determinable on the character of the soil through which the water user is required to run his ditch. Because one water user is fortunate to course his water through clay soil with perhaps little loss by seepage, while another is unfortunate as to be required to course his through gravelly and porous soil and bound to lose some of it through seepage, I do not think it may be said that the latter, for that reason, commits waste and hence is required to resort to some other and more expensive means of conveyance. Certainly he can have only what he appropriated and diverted. But if in conveying it, without negligence, though in an open ditch through porous and gravelly soil and bound to lose more water than another coursing water through other soil, I do not think it may be said that he, for that reason, wasted water, and therefore is not entitled to his appropriation, whatever that may be. And so if the Shurtliffs appropriated and diverted a one-half second foot of water at the point of diversion, and such quantity of water coursed through an open ditch constructed in a good husbandlike manner through the character of soil in which it is required to be constructed, to produce a constant flow of sufficient potable water to supply their needs for culinary, domestic and live stock purposes, then I do not see how the court may deprive them of that quantity of water on the theory of waste, or to make a less quantity of water suffice by requiring them, at their own expense, to convey the water to their premises by some other means.